BRADY, Justice.
This is an appeal from a judgment in the sum of $12,500 rendered against the City of Meridian by the Circuit Court of Lau-derdale County on account of injuries received by appellee on April 8, 1960, while working on a refuse truck for appellant. From the verdict and judgment, this appeal is prosecuted.
The relevant facts; tersely stated, are as follows. The appellee was fifty-eight years of age at the time of the trial. He was uneducated, having only a fourth grade education, and was scarcely able to read. He had no special training and was not qualified to do any work other than that of a common laborer.
He was employed by appellant as a helper or side-man on a garbage truck. The crew on this truck consisted of ap-pellee, another helper or side-man, and the driver of the truck. Ernest Bryant was the driver, James Galloway, deceased at the time of the trial of the case, was the helper on the left side of the truck, and the appellee was the helper on the right side of the truck.
The truck was commonly known as “a side or end-loader;” the body was of enclosed steel construction, with openings on both the right and left sides near the front of the body, into which the refuse was loaded. There was a hydraulically operated metal press which moved in a horizontal direction within the steel part of the truck in order to compress the refuse as it was collected. In order for the press to be put into operation it was necessary for the truck driver to take the truck out of the customary gear and put it into the hydraulic pressure gear. The record discloses that a pressure of 60,000 pounds could be built up by this hydraulic press. Once the pressure was built up, one of the side-men would start the press in motion by pushing a button or operating a lever which was located on each side of the truck just behind and outside of the cab.
The press was located to the front of the container and would push the refuse toward the rear, compressing it. When it reached the back of the container, it would automatically trip itself and return. It moved on steel tracks- by means of iron wheels, and the tracks and wheels on this press were worn. The press made some noise which could be heard by anyone around it.
On the side of the opening on each side of the truck grab irons had been placed. There was a steel corrugated step upon which the side-men could stand and hold to the grab irons when the truck was being moved from location to location in picking up garbage.
Appellant contends that the employees, including appellee, had been instructed not to stand on the step when the press was in operation. This is denied by appellee. On the occasion in question, appellee was working on the right side of the truck. The truck had stopped on the left side of the street and the other helper, Galloway, was engaged in loading the refuse into the truck. Galloway had started the press in motion. The appellee was watching for traffic, as he had been ordered to do, and, at the time, was standing with his left hand on the grab iron, his left foot on the *435 ground, and his right foot on the running board.
The proof shows that after the press had been engaged, and as it was moving on the tracks, it “hung up” and j erked or snatched, and this caused the truck to jerk, causing appellee to lose his balance and his foot to slip or to be jerked off the step. When he reached for the grab iron with his right hand, he missed it and caught hold of the side of the steel grate in front of the moving pressure plate so that his hand was crushed against the front of the steel tank or container.
While numerous assignments of error are urged, the basic error urged is that the evidence in the case does not justify a verdict in favor of the appellee as a matter of law. This error is based upon the refusal of the trial court to grant the appellant the requested peremptory instruction. The appellant also urges that the action is barred because of a release signed by the appellee, and that the verdict of the jury was so contrary to the evidence as to evince passion and prejudice.
Appellee charged in his declaration that the truck was an old model; that it came equipped with a buzzer to warn the helpers when the press mechanism was engaged, but that the buzzer had been removed; that the press mechanism was old and had become defective and did not operate as it was designed; that the appellant was guilty of negligence in that it did not exercise reasonable care to furnish appellee with a reasonably safe place in which to work; that it did not supply a safe, modern truck and did not keep the truck in good repair; that it allowed the truck to jerk or move while the press was operating; that as a proximate cause of such negligence, the right hand of appellee was crushed and he has lost the use of it.
The question resolves itself into whether, or not the appellee proved by credible testimony that appellant was negligent and that this negligence was a proximate cause of the injuries complained of. The record discloses that this truck had been purchased by appellant and driven from Ft. Worth, Texas, to Meridian, Mississippi, by Willard Massey. The proof shows that it had been used constantly in collecting refuse; that the track or channel on which the press ran and the rollers had become worn; that while the press was in operation, because of the worn condition of the track and rollers, the press would hang, and when it pulled loose it would cause the truck to jerk considerably. Willard Massey testified that the buzzer and the signal lights were working on the truck when he delivered it, but that before he quit driving the track and left the employment of the City the signal lights and buzzer were not working. With reference to whether the rollers and track were in a defective condition, the witness Massey testified as follows :
Q. Now, Mr. Massey, in the operation of this press, when garbage and boxes of books and things were up in there, did the press run smooth, or did it hang, or was it erratic, or just tell us how it operated?
A. Well at the time that I quite (sic) driving it, in other words, it had been worn, in other words, and anything that hit on the side of it, it would snatch, in other words it would snatch the press on the track there, it would snatch the crates.
Q. Now when it was snatched like that, the press, what, if anything, would it do to the truck itself?
A. Well, it would ah, — ah,—just give it a snatch, in other words, what I mean, when the press would snatch it, that truck was automatically out of gear and, in other words, it would snatch, and you could tell it was snatching in other words, you see.
Q. Was that a light snatch or a violent snatch ?
A. Well, it was just a sudden snatch.
*436 Q. And, how long had that been going on?
A. Well, it had been going about, I can’t recall, in other words before I quite (sic) driving it.
Q. I will ask you to state whether or not you called it to the attention of the people at the garage about that?
A. Yes, sir.
Q. Did they repair it?
A. Well, not as I know of.
William McMullan, who had worked approximately fifteen years for appellant, and who worked as a side-man or loader man on the same truck on which appellee was injured, testified as to the defective condition of the truck as follows:
Q. What was the condition of that truck in regard to whether the press operated smoothly, roughly,—
A. The track was worn out on the press, where the press worked backward and forth.
Q. You say the track was worn out. Now, when you say the track was worn out, what track are you referring to?
A. The track where the press pushes the garbage, works backwards and forth and pushes it back, and then the press comes back.
Q. What effect, if any, did that track being worn out have on that truck?
A. It caused it to bind on the sides, hang up, catch one side and go ahead of the other and cause it to hang up on the sides.
Q. All right sir, you said it hung up on the side, when that side came loose where it was hung, what would happen then?
A. Id’d (sic) jerk, the press would come back and it’d jerk after it come loose, and would jerk when it come on up.
Q. And what effect, if any, would that have on the whole truck itself?
A. Well, it might, it’d cause the truck to jerk, the press would when it hung up, and then the press would come loose and jerk the truck and all.
Q. Did that happen frequently or infrequently ?
A. Pretty regular, yes sir.
* * * * * *
Q. Yes, sir. Now Mr. McMullan, I want to ask you a word about this; did you give any notice to the people at the garage about that press hanging?
A. Quite a few times, sir.
Q. What was it about?
A. Well, it was about the press being hung, about it hanging up and well, ‘ the time or so I carried it back in down there for them to fix the thing and they couldn’t fit it and told us, we would just have to carry it on out and use it.
In addition, the appellee testified that he had reported the condition of the press to his superior, Mr. Fairchild, and Fairchild had stated that he knew it was worn out but he couldn’t get the parts to repair it.
There is ample evidence in this record for the jury to have found that the truck was in a defective condition and that the condition was known to the appellant; that appellant had been requested to repair or correct this condition but had failed to do so. The record discloses that on February 24, 1959, approximately thirteen months subsequent to the time the truck was purchased, the rollers and tracks on'the truck had become defective and had to be replaced. The appellant was injured on April 8, 1960. On November 29, 1960, several months subsequent to the time ap *437 pellant was injured, the rollers and track were again replaced because of their badly worn condition.
Appellant urges that appellee had been warned to stand on the ground while the press was operating. This is specifically denied by appellee. He testified that at no time had any of the officials of the City of Meridian, or anybody, ever given him instructions as to how or when to stand on the truck. He stated that on the day of the injury he was standing with one foot on the running board, watching traffic as he had been instructed to do, and he became overbalanced when the press hung and the truck jérked. He testified that in an effort to grab the other grab iron to regain his balance, he got his hand in the press. He admitted that he was aware that the press sometimes hung, causing the truck to jerk.
The appellant contends that appellee placed himself in a position of obviously manifest danger; that, knowingly, he placed his hand in a dangerous place and that this was not done because of any requirement imposed by his employment. We cannot agree with this contention. Appellee was apparently on the right side of his truck watching for traffic, as he was required to do. The truck was equipped with grab irons and appellee was holding one of these with his left hand; his left foot was resting on the ground and his right foot on the step. He was obviously waiting for the press to cease so he could mount the step where he was required to ride by appellant when the truck was moved along the street. He was not in a place of danger when he stood with his foot on the ground and one hand on the grab iron.
Appellant relies upon the case of City of Long Beach, Mississippi v. Spooner, 224 Miss. 246, 79 So.2d 833 (1955). The Spooner case is distinguishable from the case at bar in that the grounds of negligence were basically different in several respects, and in that case “The garbage truck was in good mechanical condition * * *.” (224 Miss, at 254, 79 So.2d at 835.) (Emphasis added.) The following rule was stated in Spooner:
The true rule in the respects mentioned is that when the master has taken reasonable care to furnish a reasonably suitable and safe location for the doing of the particular work'and has there installed the ordinary and generally approved equipment, suitable and proper for the place and for the work of the kind there being done and this equipment is in adequate repair, and he has furnished the appliances easily to be used in connection therewith which when used will render the operation as safe as may reasonably be done, considering the nature of the work and the character of the machinery appropriate thereto, the master has performed his duty, in so far as concerns the doctrine of a safe place to work and of safe appliances with which to work, although there still be danger in the work. (224 Miss, at 254-255, 79 So.2d at 836.)
In the case at bar, the proof is sufficient to justify the jury in finding that, because of the defective condition of the truck and because of its operation in this defective condition, the truck was caused to jerk or snatch when the press was in operation; that appellee’s foot slipped and, in his effort to grasp the other grab iron, he failed to do so and caught his hand between the press and the side of the truck. The jury was justified in finding that one of the proximate causes of the appellee’s injury was the defective condition of the truck and the resulting jerks caused in its operation.
In the case of American Creosote Works of Louisiana v. Harp, 215 Miss. 5, 60 So.2d 514, 35 A.L.R.2d 603 (1952), this Court held:
There may be more than one proximate cause of an injury, 38 Am.Jur., Negligence, § 63, and if appellant’s negligence *438 proximately contributed to the injury, as the jury has found that it did, then appellant is liable even though its negligence was not the sole proximate cause thereof. (Citing cases). Moreover, when reasonable minds might differ on the matter, the question of what is the proximate cause of an injury is usually a question for the jury, 65 C.J.S., Negligence, § 264, and likewise questions of negligence and contributory negligence are generally for the determination of a jury. (215 Miss, at 12-13, 60 So.2d at 517.)
See also Matthews v. Thompson, 231 Miss. 258, 95 So.2d 438 (1957).
As previously stated the record shows that appellant had repaired this truck approximately thirteen months subsequent to the time it was purchased and again repaired it about seven months subsequent to the time appellee sustained his injury. The jury was justified in finding that appellant was notified that the defective condition existed, that appellant negligently failed to maintain and repair the truck as it should have done, and that the truck was unsafe for the job for which it was being used.
We hold that the trial court was correct in refusing to grant the peremptory instruction requested by appellant, and these questions of negligence were properly submitted to the jury. As was stated in the case of Fowler Butane Gas Co. v. Varner, 244 Miss. 130, 149, 141 So.2d 226, 232 (1962), “The general rule is, where there is a conflict in the evidence, the question of negligence is for the determination of the jury.” (Citing cases.)
The next assignment of error urged by appellant which merits consideration is that his plea in bar of accord and satisfaction should have been sustained as a matter of law. The plea in bar was an affirmative defense urged by appellant and showed that appellee had executed a full and complete release for the consideration of $1,623.77, the amount of the hospital and doctors’ bills incurred in the treatment of appellee’s injuries. In connection with this assignment, appellant also urges that instructions granted appel-lee with reference to the release were erroneous. The second portion of this assignment of error will be hereinafter considered and we direct ourselves to the question of whether or not the release was knowingly and voluntarily executed by the appellee and was in fact a voluntary release and therefore a bar to his cause of action.
Again we are faced with issues of fact, and again we are forced to hold that the trial court properly submitted to the jury* the determination of these issues of fact.. Appellant contends that the release was-voluntarily and freely executed by appellee, which is strenuously denied by appellee. The record discloses that on September 21, 1960, the City Council of Meridian passed, a resolution authorizing the City Manager-to pay the sum of $1,623.77 to appellee to-reimburse him for his hospital and doctors’" bills. The order contained a statement to' the effect that appellee had requested the City to pay such medical expenses. It is undisputed that the appellee was not present when the order was passed, and there-is no testimony that this matter was ever-discussed with appellee.
The record discloses that on October 3, 1960, the appellee was summoned to the-City Manager’s office. Mr. Forrester, the-City Manager, Mr. Slaughter, City Engineer, and Mrs. Pierce, Secretary to Mr.. Forrester, were present. Appellee denies, that the release was handed to him and that he was permitted to read it. He also denies that the release was read to him. He testified that he went to the office of' the City Manager, and that Mr. Slaughter was present, and that Mr. Forrester stated to him that he wanted him to sign the paper, saying, “the doctor wants his. money.”
*439 The appellee stated that Mr. Forrester said:
(W)e want you to sign this paper here, the doctor wanted his money, he said he wanted his settlement, and I said, well, I can’t sign it, and held my hand up, just like this; and I says, the doctor wants me to come back out there in two months for him to look at my hand and he says, that’s all right, I talked to the doctor and the doctor says it’ll be all right for you to sign it, and I says, well I can’t sign it; if I was to, I would have to get somebody to sign it for me; Mr. Slaughter was standing over there and he says, sign it, Jim.
Appellee denies he was shown any papers. Mrs. Pierce, shown to be a witness to the purported release, testified that she remembered that Mr. Slaughter signed Mr. God-win’s name, but she did not hear any conversation explaining the release, or the release being read to appellee; she did not see appellee read the release. Furthermore, Mr. Forrester admitted he did not read the release to the appellee and that appellee did not read it; that he told appellee it would be necessary to have the paper signed so the hospital bill could be paid. Appellee denied that he touched the pen or made the “X”, and denied that he authorized anyone to sign for him.
The record discloses that the voucher which was paid to Rush Hospital included everything owed to the hospital at that time, including the bills incurred by appellee. While Mr. Forrester denied that the City had any arrangements or contract with Rush Hospital for the care of any employees of the City who were injured, nevertheless, he stated, “of course the City does look after their employees if they are injured on the job.” The record does not disclose that the purported release was ever handed to the appellee for reading, but it is shown that the release was not read to ap-pellee at least in full by the testimony of the City Manager, Mr. Forrester, who testified as follows:
Q. Now, then, you did not read it to him, did you?
A. Verbatim, no, sir.
Q. When you say “verbatim, no, sir,” what are you talking about, Mr. Forrester, you either read it to him or you didn’t, did you read it to him?
A. It was explained to Mr. Godwin.
Q. Now I didn’t ask you anything about explanations, sir, all I am asking you, Mr. Forrester, do you mind answering this simple question, did you read the release to Mr. Godwin?
BY MR. HOLYFIELD (Interposing) We object to this, he has already answered he didn’t read the release.
The record further discloses that the ap-pellee received no actual cash or remuneration for the purported execution of the release. Taking into consideration the appel-lee was an ignorant man with only a fourth grade education and having little ability to read and write, and considering also that he was called into the City Manager’s office to face two men, either of whom could have fired him, and the fact that ap-pellee testified he did not read the release and it was not read to him, and the fact that Mrs. Pierce testified she did not hear any conversation explaining the release or hear the release read to Mr. Godwin, and did not see Mr. Godwin read the release, more than justifies the trial court in submitting to the jury the questions of whether the release was knowingly, voluntarily and freely executed by the appellee, and whether the release could be utilized by the appellant as a plea in bar.
These questions were resolved by the jury against the appellant. The record shows that the appellee received a serious injury resulting in the loss of three fingers on his right hand and the little finger is *440 crooked and stiff. He was confined in the hospital for approximately nine weeks, followed by approximately three months of convalescence. The proof is ample to show that he suffered great physical pain and mental anguish. 'As a laboring man his efforts are now restricted because he has only one hand and the remnants of another hand. The jury had a right to consider whether or not this physical disability would result in the loss of earnings. The appellant’s assignment of error that the verdict was so contrary to the overwhelming weight of the evidence as to evince passion and prejudice on the part of the jury is not well taken. Under the facts of this case we cannot hold that a jury award of $12,500 was unreasonable.
As was stated in the case of Stoner v. Colvin, 236 Miss. 736, 751, 110 So.2d 920, 925 (1959), “The amount of damages to be awarded in personal injury cases is peculiarly within the province of the jury.”
We have read this record and carefully reviewed the excellent' briefs which have been filed by both appellant and appellee. A careful study of the instructions given in this case convinces us that the jury was properly instructed when all the instructions are read together as a whole. We find no reversible error in the granting of the instructions. We do not feel that the jury was misled into reaching an improper verdict herein. This was certainly a proper case for determination by a jury, and we are constrained to hold that the proper verdict was reached in this case. For these reasons, the case is affirmed.
Affirmed.
All Justices concur, except PATTERSON, SMITH and ROBERTSON, JJ., who dissent.