638 So.2d 1252 (1994)
Albert Ray SMITH
v.
William L. SNEED.
No. 91-CA-0180.
Supreme Court of Mississippi.
January 27, 1994.
Rehearing Denied June 23, 1994.
Opinion Dissenting From Denial of Rehearing June 23, 1994.
Jim Waide, Waide Law Office, Tupelo, J. Dudley Williams, Aberdeen, for appellant.
L.F. Sams, Jr., Thomas D. Murry, Michael D. Chase, Tacey Clark Humphrey, Mitchell McNutt Threadgill Smith & Sams, Tupelo, for appellee.
Before DAN M. LEE, P.J., and SULLIVAN and PITTMAN, JJ.
DAN M. LEE, Presiding Justice, for the Court:

STATEMENT OF THE CASE
On June 1, 1988, Albert Ray Smith ("Smith") filed suit against attorney William L. Sneed ("Sneed"), alleging that Sneed had committed legal malpractice during his representation of Smith some years earlier. Sneed had represented Smith against a charge of murder for the killing of Jimmy Lamons ("Lamons"). Smith pled guilty to manslaughter on July 10, 1979, and was sentenced to spend twenty (20) years in the state penitentiary on July 13, 1979. On June 1, 1982, through new counsel, Smith obtained a copy of the autopsy of his alleged victim which revealed that the victim had died of natural causes. Due to this newly discovered evidence, Smith's conviction for manslaughter was set aside on October 26, 1982, and a new trial was ordered. Pursuant to a release *1253 signed by Smith on November 8, 1982, the charge of manslaughter was dismissed and Smith was released from prison.
Several years later, on June 1, 1988, Smith initiated the present suit claiming that Sneed was negligent in failing to obtain a copy of the victim's autopsy report before advising him to enter a guilty plea to the charge of manslaughter. Sneed moved for summary judgment on the grounds that any action for legal malpractice was barred by the six-year statute of limitations of Miss. Code Ann. § 15-1-49 as it ran from the date of Smith's sentencing. Alternatively, Sneed claimed that the release executed by Smith released Sneed and others from any and all claims arising out of the case. The trial judge agreed with the position of Sneed and entered summary judgment in his favor. From this adverse decision, Smith appeals, assigning as error the following:
I. The Circuit Judge erred in ruling that the statute of limitations ran from the time Smith entered his guilty plea.
II. Whether the "Release" signed by Smith was freely and voluntarily executed was a question of fact, not of law. Thus, the Circuit Judge erred in granting summary judgment on this issue. Additionally, the Release contravenes public policy.
Today, we hold that the statute of limitations in a legal malpractice action properly begins to run on the date the client learns or through the exercise of reasonable diligence should learn of the negligence of his lawyer. Questions of material fact exist related to the application of this standard. Furthermore, questions of material fact, sufficient to preclude summary judgment, existed with regard to the voluntariness of the waiver executed by Smith. Accordingly, we reverse and remand for further proceedings as if the motion for summary judgment had been denied.

STATEMENT OF THE FACTS
Smith's relationship with Sneed began on March 9, 1979, when Sneed was appointed by the Pontotoc County Circuit Court to defend Smith against a charge of aggravated assault. (Cause No. 8684, styled "State of Mississippi v. Albert Ray Smith, Defendant"). The charge resulted from Smith's shooting of Jimmy Lamons with a shotgun on November 26, 1978.
After the shooting on November 26, 1978, Lamons was first treated at the Pontotoc County Hospital. However, he was subsequently transferred to the Veteran's Administration Hospital in Memphis, Tennessee, on November 27, 1978. Approximately two months later, on January 14, 1979, Lamons died while still at the VA Hospital in Memphis. The charge was subsequently changed to murder on January 15, 1979, when the State learned of the victim's death.
On March 8, 1979, Smith was indicted for the murder of Jimmy Lamons of Pontotoc. As the result of a plea bargain, Smith pled guilty to manslaughter on July 10, 1979. Prior to entry of this guilty plea, Sneed purportedly requested an autopsy report on the victim from the district attorney's office. However, Sneed stated that he was informed that no autopsy report was in the file and that the district attorney's office did not know anything about an autopsy report. Despite lacking a copy of the autopsy, Sneed advised Smith to plead guilty to the reduced charge of manslaughter which he did in fact do, as noted above. On July 13, 1979, Smith was sentenced to twenty (20) years in the custody of the Department of Corrections.
From November 26, 1978, until his transfer to the State Penitentiary at Parchman on January 12, 1982, Smith was incarcerated in the Pontotoc County Jail. While in the Pontotoc County Jail, Smith was told by Constable Bobby King of Pontotoc County that Mrs. Linda Lamons, widow of the victim, had informed King that she hoped Smith would be moved to Parchman before he discovered the results of the Shelby County autopsy report. This conversation took place on or about August 1, 1980.
Upon learning of this fact, the plaintiff asked Sneed to try to obtain a copy of the autopsy report, which Sneed agreed to do. Sneed wrote to the VA Hospital in Memphis on September 24, 1980, and received a reply *1254 from the VA on October 8, 1980. The VA informed Sneed that it required a consent form signed by the victim's next of kin before it would release the victim's autopsy report. Sneed made no further efforts to obtain a copy of the autopsy report.
Subsequent to his transfer to Parchman on January 12, 1982, Smith secured a copy of the autopsy report through new counsel then representing him, Attorney John Johnson. The autopsy report revealed that the victim, Lamons, had died of natural causes and not necessarily from the gunshot wounds allegedly inflicted by Smith on November 26, 1978. In view of this newly discovered evidence, on September 8, 1982, Smith filed a Petition for Writ of Error Coram Nobis. This petition was granted on October 26, 1982 and a new trial was ordered.
On November 8, 1982, Smith executed a release in which he fully and completely released all claims and causes of action against all defense counsel (including Sneed), all state's attorneys, all law enforcement officers and all prosecuting witnesses in consideration for a dismissal of the manslaughter charge against him. That same date, Smith was released from prison.
This release also purportedly resolved the jail break sentencing that was pending against Smith. The jail break charge arose as the result of Smith's escape from jail in October, 1980. He was recaptured less than a month later and was charged with the offense of jail break on October 18, 1980. He pled guilty to this offense on July 13, 1981. At the time he signed the release he was still awaiting sentencing on this charge. While it is not entirely clear from the record, it appears that Smith served approximately two years for this offense despite the release.
On June 1, 1988, Smith initiated the present action, alleging that Sneed was negligent in advising him to plead guilty to manslaughter before obtaining a copy of the victim's autopsy report. The Circuit Judge dismissed the action on the grounds that the statute of limitations began to run when Smith first pled guilty in 1979. Alternatively, the trial judge ruled that Smith had no cause of action because he had "freely and voluntarily" signed a release, relieving defense counsel Sneed of any responsibility. This appeal followed.

I. The Circuit Judge erred in ruling that the statute of limitations ran from the time Smith entered his guilty plea.
"Legal negligence actions are governed by Miss. Code Ann. § 15-1-49 which, at the time the instant suit was commenced, prescribed a limitations period of six years." Steven v. Lake, 615 So.2d 1177, 1181 (Miss. 1993). At the time Smith filed his suit in June, 1988, Miss. Code Ann. § 15-1-49 provided:
§ 15-1-49. Limitations applicable to actions not otherwise specifically provided for. All actions for which no other period of limitation is prescribed shall be commenced within six years next after the cause of such action accrued, and not after.
Both parties agree that this action is governed by Miss. Code Ann. § 15-1-49. However, they disagree as to what date this statute began to run. Sneed claims that the six-year period began to run either on July 10, 1979, when Smith pled guilty to manslaughter, or on July 13, 1979, when Smith was sentenced. Alternatively, Sneed contends that the limitations period began to run, at the latest, in August, 1980, when Smith was told by Constable King about the existence of an autopsy report which possibly exonerated Smith. This is so, according to Sneed, because at that point Smith knew, or should have known, of Sneed's negligence.
Smith argues that the limitations period did not begin to run until November 8, 1982, when he was released from prison, in that the full extent of his damages was not ascertainable until that date. Alternatively, Smith argues that the limitations period began to run, at the earliest, on June 1, 1982, when he obtained a copy of the autopsy report of Lamons which did, in fact, exonerate Smith, indicating that Lamons had died of natural causes.
In determining when the limitations period began to run, the trial judge stated:
It is the court's opinion that a cause of action accrues as soon as an injury is sustained *1255 as a result of a defendant's alleged culpable conduct. See Ford Motor Co. v. Broadway, 374 So.2d 207, 209 (Miss. 1979). The likelihood of continuing or future injury is merely a factor in assessing the damages recoverable by the plaintiff.
Under this principle, plaintiff's cause of action accrued when he sustained injury as result of the alleged negligence of defendant  that is, when he was convicted of manslaughter and sentenced to a term of imprisonment on July 13, 1979. Accordingly, this action, brought more than six years after that date, is barred by the statute of limitations.
The trial judge found that Smith's cause of action accrued on July 13, 1979, and that the claim was time-barred. This approach appears to be consistent with this Court's interpretation of Miss. Code Ann. § 15-1-49. In Kilgore v. Barnes, 508 So.2d 1042 (Miss. 1987), this Court was confronted with a medical malpractice claim. In addressing the relevant limitations of actions period, this Court stated "[i]f this action were governed by our general, catch-all six year statute of limitations, Miss. Code Ann. § 15-1-49 (1972), we would hold it barred. Under that statute, we have heretofore held that claims accrue and the clock begins to tick on the date of the wrongful act complained of." Id. at 1044. The wrongful act complained of, Smith's wrongful imprisonment due to Sneed's failure to obtain a copy of Lamon's autopsy report, occurred when Smith was sentenced to twenty (20) years in prison on July 13, 1979. Therefore, applying the "time of injury" standard, it would appear that the period began to run from that date and Smith's action for legal malpractice, filed on June 1, 1988, was correctly held by the trial judge to be untimely.
Smith counters this argument by contending that the limitations period could not have begun to run until November 8, 1982, when he was finally released from prison in that the full extent of his injuries could not have been ascertainable until that date. Smith appears to be arguing that the harm caused by the alleged negligence of Sneed was in the nature of a continuing injury. The trial judge rejected this position, stating:
Plaintiff contends that the cause of action did not accrue until he was released from jail. He argues that when an injury is "continuous," the cause of action does not accrue until the injury ceases. Plaintiff's position, however, is untenable. Under plaintiff's theory, a cause of action would never be time-barred if the potential plaintiff alleged that he was still suffering injury as a result of the defendant's wrongful act. For example, a cause of action wherein the plaintiff claimed damages for permanent disability or future pain would never be barred by limitations. In the context of a case of this nature, a prisoner under a 30-year sentence would be permitted to bring suit against his attorney up to 36 years after the alleged negligent act occurred.
As noted above, the trial judge found that the cause of action accrued at the time the injury was sustained on July 13, 1979. Based on this Court's opinion in Stevens v. Lake, 615 So.2d 1177 (Miss. 1993), the trial judge was correct in rejecting Smith's claims of a continuing injury. In Stevens, the plaintiffs filed suit against their attorney, alleging malpractice in the attorney's handling of a trust he formed in 1979. The plaintiffs argued that a new cause of action arose every year that the plaintiffs suffered financial losses as the result of the trust's failure. This Court rejected this argument, stating:
It is true that continuing or repeated injuries can give rise to liability even if they persist beyond the limitations period for the initial injury. See Hendrix v. City of Yazoo City, 911 F.2d 1102 (5th Cir.1990); C.J.S., Limitations of Actions § 177 at 230-32 (1987). This principle applies, however, in situations where the defendant commits repeated acts of wrongful conduct, not where harm reverberates from a single, one-time act or omission:
[W]here a tort involves a continuing or repeated injury, the cause of action accrues at, and limitations begin to run from, the date of the last injury, or when the tortious acts cease. Where the tortious act has been completed, or the tortious acts have ceased, the period of *1256 limitations will not be extended on the ground of a continuing wrong.
A "continuing tort" is one inflicted over a period of time; it involves a wrongful conduct that is repeated until desisted, and each day creates a separate cause of action. A continuing tort sufficient to toll a statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation.

C.J.S., Limitations of Actions § 177 at 230-31 (emphasis added); see also Hendrix, 911 F.2d at 1102 (where violation occurs outside limitations period but is closely related to violations occurring within the period, recovery is permitted on theory that all violations are part of one continuing act).
Stevens, 615 So.2d at 1183.
The Court found that the principle of "continuing injury" did not apply in Stevens, holding that any act of negligence on the part of the attorney occurred in 1979 and, insofar as the record reflected, was never repeated. Such is the situation in the case at bar. Smith's injury resulted from Sneed's negligent failure to obtain a copy of Lamon's autopsy report before advising him to plead guilty to manslaughter. The harm suffered by Smith subsequent to this negligence was his imprisonment for approximately four (4) years. However, this harm did not arise from any repeated wrongful conduct by Sneed, but rather from the single, one-time act of Sneed's failure to obtain a copy of the autopsy report. As such, the injuries suffered by Smith were not "occasioned by continual unlawful acts" but rather were the "continual ill effects from an original violation." Stevens, 615 So.2d at 1183. This "original violation" occurred on July 13, 1979, when Smith was sentenced to twenty (20) years in prison. Therefore, there is no merit in Smith's continuing injury argument.
Smith presents an alternative theory for holding the action timely, urging this Court to adopt a "discovery" standard for matters of legal malpractice. The discovery standard is recognized in Mississippi as it is codified in two different statutes  Miss. Code Ann. §§ 15-1-36 and 15-1-67. However, these statutes deal with two specific areas  medical malpractice claims and claims that have been fraudulently concealed. There is no allegation by Smith that Sneed fraudulently concealed his failure to obtain the autopsy report, thus Miss. Code Ann. § 15-1-67 is inapplicable. Miss. Code Ann. § 15-1-36 addresses only medical malpractice claims and clearly has no application in the present case. However, Smith argues that the discovery provision of Miss. Code Ann. § 15-1-36 should apply with equal force to legal malpractice claims, arguing:
The Mississippi general statute of limitations, Miss. Code Ann., Sec. 15-1-49, does not deal with the question of when the statute of limitations begins to run. It says simply that the statute of limitations is "six years after the cause of action accrued". In contrast, the statute of limitations dealing with medical malpractice actions, Miss. Code Ann., Sec. 15-1-36, specifies that the statute of limitations does not begin to run until after Plaintiff discovers a cause of action. Smith v. Sanders, 485 So.2d at 1051. Obviously, the legislature intended, in passing a subsequent statute, Miss. Code Ann., Sec. 15-1-36, to cure the ambiguity that is inherent in Miss. Code Ann., Sec. 15-1-49. It would be preposterous to think that the legislature would think that a cause of action for legal malpractice would accrue when the injured party could not know that he had a claim, but a claim for medical malpractice would accrue only when the injured party knew of his claim.
We agree: this Court has created similar exceptions in the past, the Legislature's failure to extend the discovery rule beyond medical malpractice notwithstanding. In Owens-Illinois, Inc. v. Edwards, 573 So.2d 704 (Miss. 1990), this Court was asked to decide when a cause of action for latent disease or injury accrued for purposes of the six-year limitations period of Miss. Code Ann. § 15-1-49  at the date of injury or upon the discovery thereof. In holding that the cause of action accrued at the point of discovery, we stated:
We find our decisions in Ford Motor Co., Tabor Motor Co. and Staheli to be persuasive *1257 and controlling. In the context of a latent disease cause of action, it would be illogical to equate the time of the wrongful act or omission, in this case the last exposure to the allegedly harmful or defective product, with the time of the injury, as we did in Wilder [v. St. Joseph Hosp., 225 Miss. 42, 82 So.2d 651 (1955)]. Illogical results, such as the finding that plaintiffs are barred from seeking relief from injuries which are undiscoverable until the pertinent time for seeking such relief has passed, would not only undermine the purposes for which statutes of limitations exist, but would also engender disrespect for our civil justice system.
Id. at 708-09.
Additionally, in Staheli v. Smith, 548 So.2d 1299 (Miss. 1989), the Court again created a discovery standard for a limitations statute, Miss. Code Ann. § 15-1-35, where previously one was not found. In Staheli, the plaintiff brought suit for allegedly defamatory material which had been placed in his tenure file. The defendant contended that the suit was barred by Miss. Code Ann. § 15-1-35, stating that the statute began to run from the date of the publication of the allegedly libelous material to a third party. The plaintiff contended that the statute did not begin to run until he reasonably, by due diligence, was able to discover this material. We agreed, stating:
We are convinced that the general policies underlying this statute of limitations will not be thwarted by adoption of the discovery rule in that limited class of libel cases in which, because of the secretive or inherently undiscoverable nature of the publication the plaintiff did not know, or with reasonable diligence could not have discovered, that he had been defamed. In such rare instances, we do not believe that a plaintiff can be accused of sleeping on his rights.
Id. at 1303.
These arguments for applying a discovery standard are no less compelling in legal malpractice actions. As the Texas Supreme Court persuasively stated in adopting a discovery rule for legal malpractice actions:
An attorney is obligated to use the skill, prudence, and diligence commonly exercised by practitioners of his profession. The California Supreme Court has recognized that a "[c]orollary to this expertise is the inability of the layman to detect its misapplication; the client may not recognize the negligence of the professional when he sees it." Neel v. Magana, Olney, Levy, Cathcart & Gelfand, 6 Cal.3d 176, 188, 491 P.2d 421, 428, 98 Cal. Rptr. 837, 844 (1971). A Texas commentator states: "[i]t is unrealistic to expect a layman to perceive an injury at the time of the negligent act or omission of his attorney." Ward, Legal Malpractice in Texas, 19 S.Tex.L.J. 587, 613 (1978).
The special relationship between an attorney and client further justifies imposition of the discovery rule. A fiduciary relationship exists between attorney and client. McClung [v. Johnson], 620 S.W.2d [644] at 647 [1981]. As a fiduciary, an attorney is obligated to render a full and fair disclosure of facts material to the client's representation. Id. The client must feel free to rely on his attorney's advice. Facts which might ordinarily require investigation likely may not excite suspicion where a fiduciary relationship is involved. Robinson v. Weaver, 550 S.W.2d 18, 23 (Tex. 1977) (Pope, J., dissenting). Further, breach of the duty to disclose is tantamount to concealment. McClung, 620 S.W.2d at 647. Thus, the California Supreme Court writes: `[p]ostponement of accrual of the cause of action until the client discovers, or should discover, the material facts in issue vindicates the fiduciary duty of full disclosure; it prevents the fiduciary from obtaining immunity for an initial breach of duty by a subsequent breach of the obligation of disclosure.' Neel, 6 Cal.3d at 189, 491 P.2d at 429, 98 Cal. Rptr. at 845.
Were we to follow the general rule, the client could protect himself fully only by ascertaining malpractice at the moment of its incidence. To do so, he would have to hire a second attorney to observe the work of the first. This costly and impractical solution would but serve to undermine the confidential relationship between attorney *1258 and client. See id. at 188, 491 P.2d at 428, 98 Cal. Rptr. at 844.
* * * * * *
In sum, we believe that any burden placed upon an attorney by application of the discovery rule is less onerous than the injustice of denying relief to unknowing victims. See Note, Accrual of Statutes of Limitations, 68 Calif.L.Rev. 106, 119 (1980); Note, Limitation of Action, 46 Texas L.Rev. 119, 120-21 (1967).
Willis v. Maverick, 760 S.W.2d 642, 645-46 (Tex. 1988).
The Texas Supreme Court noted that in adopting the discovery standard for legal malpractice actions, the holding brought:
Texas in line with an ever increasing majority of states that have recognized the inherent unfairness of commencing the statute of limitations in legal malpractice causes of action on the date of the occurrence of the negligent act or omission, or of the legal injury caused therefrom, notwithstanding the fiduciary relationship between attorney and client and the lack of knowledge, actual or constructive, on the part of the client.
Id. at 646.
To remedy this problem, the Texas Supreme Court noted that at least twenty-four states had judicially adopted a discovery standard for legal malpractice actions, including Arizona (1983), California (1971), Colorado (1986), Delaware (1979), Florida (1973), Illinois (1973), Iowa (1982), Kentucky (1979), Louisiana (1984), Maryland (1969), Massachusetts (1974), Nevada (1979), New Hampshire (1976), New Jersey (1983), New Mexico (1979), North Dakota (1981), Ohio (1983), Oklahoma (1985), Oregon (1987), South Carolina (1979), Tennessee (1985), Washington (1976), West Virginia (1974), and Wisconsin (1983). Additionally, the Texas Supreme Court stated that at least three states  Montana, Michigan, and Pennsylvania  had adopted the discovery standard by legislative enactment.
Based on this Court's decisions in Staheli and Owens-Illinois, Inc. which engrafted discovery standards on limitations statutes where none previously existed and upon the reasoning of the Texas Supreme Court in Maverick, we are convinced that we have both the authority and the duty to adopt the discovery rule for legal malpractice actions.
Applying this discovery standard, Smith argues that he did not know through the use of reasonable diligence of the contents of the autopsy report until his new counsel obtained a copy of it on June 1, 1982. Contrary to the opinion of the lower court, this assertion is by no means rebutted by Smith's statement to the effect that a constable had told him earlier that Lamons died of natural causes:
Q... . In paragraph 7, you have charged that on June 1, 1982, you learned that the autopsy showing that the victim Lamons had died of natural causes; is that correct?
A. Yes, that's when I knew for sure.
Q. Had you heard it at an earlier time?
A. I had.
Q. What had you heard?
A. I had heard that there was an autopsy performed and that I did not kill the man, that he died of natural causes.
Q. Who first told you about that?
A. Constable Bobby King.
* * * * * *
Q. So that would have been before October of 1980; is that correct?
A. Correct.
* * * * * *
Q. And did you believe the information that he gave you?
A. Well, yes, I did.
Deposition of Albert Ray Smith at 11-12.
Simply put, whether King, a layman, recounted the contents of the autopsy report in a manner sufficient to put Smith on notice that his attorney had been negligent was a fact question for jury determination. Accordingly, the grant of summary judgment was premature.

*1259 II. Whether the "Release" signed by Smith was freely and voluntarily executed was a question of fact, not of law. Thus, the Circuit Judge erred in granting summary judgment on this issue. Additionally, the Release contravenes public policy.
As noted above, after obtaining a copy of Lamons' autopsy report on June 1, 1982, Smith's new attorney moved for a Writ of Error Coram Nobis. In response thereto, on October 26, 1982, the Circuit Court of Pontotoc County set aside Smith's conviction for manslaughter and ordered a new trial. Additionally, on November 8, 1982, the Circuit Court of Pontotoc County ordered Plaintiff's release from prison. However, in order to obtain his release from prison, Smith was required to sign the following release:
RELEASE
KNOW ALL MEN BY THESE PRESENTS, that I, the undersigned, am currently charged in the Circuit Court of Pontotoc County, Mississippi, with the offense of manslaughter, in Cause No. 8684 thereof, and, further, that I am awaiting sentence in the Circuit Court of Pontotoc County, Mississippi after having entered a plea of guilty to the offense of jail break, in Cause No. 8756; that the circumstances of said manslaughter charge and sentencing are as follows, to wit:
1. That I was indicted in Cause No. 8684 of the aforesaid Court for the offense of murder on March 8, 1979.
2. That on July 10, 1979, the offense of murder was reduced to that of manslaughter by Order of the Court.
3. That on July 10, 1979, I entered a plea of guilty to the offense of manslaughter on the aforesaid charge.
4. That on July 13, 1979, I was sentenced to serve a term of twenty (20) years in a facility to be designated by the Department of Corrections for the offense of manslaughter.
5. That I was represented in Cause No. 8684 by and through the time of sentence by the Honorable William L. Sneed, Attorney at Law, Pontotoc, Mississippi.
6. That on October 26, 1982, pursuant to application and motion therefor, the Circuit Court of Pontotoc County, Mississippi entered its Order Granting Writ of Error Coram Nobis and Granting New Trial in Cause No. 8684, the effect of which was to set aside my conviction for the offense of manslaughter and restore same to the trial docket of Pontotoc County, Mississippi.
7. That I was indicted on October 18, 1980, for the offense of jail break, in Cause No. 8756, of the Pontotoc County Circuit Court.
8. That on July 13, 1981, I entered a plea of guilty to the charge of jail break, by and through the Honorable W.A. Grist, Attorney at Law, who was and is my appointed counsel on the aforesaid charge.
9. That on July 17, 1981, sentencing on the plea of guilty to the offense of jail break was deferred until the next term of this Court.
10. That I am now facing trial for the offense of manslaughter in Cause No. 8684 of the Pontotoc County, Circuit Court, and I am awaiting sentencing in Cause No. 8756 for the offense of jail break in the Pontotoc County Circuit Court.
I do not admit that I am guilty of the charge of manslaughter, and I am desirous of disposing of the sentencing on the charge of jail break. I wish and desire to have the criminal charge of manslaughter dismissed and thereby avoid the risk of being convicted in a criminal proceeding for manslaughter.
Therefore, in order to induce the State of Mississippi and all prosecuting witnesses to request a dismissal of the charge of manslaughter, and in consideration of a dismissal of the charge against me, I, Albert Ray Smith, do, hereby, forever release and finally discharge the following persons, to wit:
All defense counsel, including the Honorable William L. Sneed and the Honorable W.A. Grist.
All State's Attorneys, including the District Attorney, all Assistant District Attorneys, *1260 and the County Prosecuting Attorney.
All law enforcement officers.
All prosecuting witnesses or potential prosecuting witnesses.
I, Albert Ray Smith, do, hereby, forever release and discharge the above named persons, and any and all other persons whatsoever from any and all claims or causes of action, if any, that I might have or may have had or may have in the future against them as a result of my arrest and detention in Cause Nos. 8684 and 8756 of the Pontotoc County Circuit Court, whether said claim or cause of action, if any, arises out of an alleged false arrest or malicious prosecution or for whatever other grounds possible.
As part of his motion for summary judgment, Sneed asserted that this release executed by Smith barred the action. The trial judge agreed with this assertion, stating:
Plaintiff does not dispute that he signed the release. He contends, however, that the release does not absolve defendant from liability, because (1) it was not voluntarily executed, and (2) its enforcement would violate public policy. Plaintiff contends that there is a genuine issue of fact as to whether the release was voluntary, thereby precluding summary judgment on the issue.
The basis of the plaintiff's contention that the release was not voluntary is that the release was "obtained through threat of keeping Plaintiff in jail." There is no genuine issue as to the fact that the consideration for the release was the dismissal of the manslaughter charge against the plaintiff and his release from jail. The court is of the opinion, however, that the circumstances under which the release was obtained could be considered coercive only if the law enforcement officials involved were wrongfully holding plaintiff in custody or wrongfully threatening to place him on trial for manslaughter. It is clear that the law enforcement officials legitimately had the power to bring plaintiff to trial on the charge of manslaughter or on the lesser charge of aggravated assault. Plaintiff was also facing sentencing for the offense of jailbreak. On the undisputed facts, the court concludes as a matter of law that the release did not violate the public policy of the state of Mississippi. Accordingly, the release is valid and enforceable and operates as a complete defense to the claims asserted against defendant in this action.
Smith claims that the trial judge erred in entering summary judgment for Sneed in that there was, in fact, a genuine issue of fact concerning the voluntariness of the release he signed. Smith claims that the following passage from Smith's deposition could lead a reasonable juror to conclude that the release was not given voluntarily. In this deposition, Smith in response to questioning by Sneed's attorney L.F. Sams, stated:
Q. I would like for you to look at that [the release] and tell me whether you recognize that as a document that you signed on November the 8th, 1982.
A. I don't recall reading it. I recall my lawyer read it.
* * * * * *
Q. Okay. Did you sign this Release on the advice of your counsel, Mr. Johnson?
A. I was told when I signed this that all charges against me would be dropped, and I would be released.
Q. Were you?
A. I was released on one charge.
Q. Did you sign this release with the advice of your counsel, Mr. Johnson, who was then representing you?
A. Well, I don't know where it was advice, but I know I didn't read it. Like I say, if I signed this paper, I would get out of jail, or otherwise, I would go back to court.
Q. Did you talk with Mr. Johnson about signing this release?
A. More than likely I did.
Q. And that is your signature, isn't it?
A. It is.
Q. In other words, you voluntarily signed the paper, did you not?
A. Well, I don't know whether you would call it that or not. I signed it to get out of jail.

*1261 Q. That was your purpose?
A. Yes, sir.
Q. Did you get out of jail after you signed this release?
A. Well, like I say, I was told that all charges against me would be dropped if I signed that. And when I signed it, I was carried back to the same hearing and given two years for escape.
Smith claims that the issue of the voluntariness of the release he signed was a fact issue that should have been passed upon by a jury. A similar case decided by this Court in which a party was compelled to sign a release under threat of criminal prosecution was Service Fire Ins. Co. of N.Y. v. Reed, 220 Miss. 794, 72 So.2d 197 (1954). In Reed, the appellee, "an ignorant farm hand," filed a claim with the appellant insurance company for the loss of his car in a fire. Id. at 797. The insurance adjuster informed Reed that they would find out that he burned the car and put him in the penitentiary. As such, Reed signed a proof of loss which contained a release upon the insurance company paying off the amounts owed on the car. Later, Reed brought suit for the value of the car, claiming "that the release was obtained under threat of criminal prosecution for arson, and was void." Id. In agreeing with the argument set forth by Reed, this Court stated:
We hold that where a release is obtained by threats of criminal prosecution under such circumstances that the one executing the release is deprived of the free exercise of his will, such release may be avoided on the ground of duress. 17 Am.Jur., Duress and Undue Influence, Par. 11.
Id. at 798.
In Reed, we recognized that there were circumstances in which a person could be coerced into signing a release and that in such cases, releases obtained under said circumstances could possibly be avoided. Such circumstances were present in Reed  the threat of criminal prosecution if the release was not signed, the fact that Reed was not represented by counsel when he signed, the superior bargaining position of the insurance company, and Reed's lack of education. In light of those circumstances, the jury returned a verdict in favor of Reed, which this Court affirmed.
In Reed, a jury was allowed to decide the issue of whether the release was obtained in good faith and with the full understanding on the plaintiff's part of his legal rights. Such an approach is consistent with other decisions of this Court wherein the Court has held that, relating to releases, issues of good faith, voluntariness, and duress were questions properly submitted to a jury. See Willis v. Marlar, 458 So.2d 722 (Miss. 1984) (whether release signed by injured plaintiff at behest of defendant's insurer was void because there was an absence of good faith and full understanding of legal rights or nature of release was misrepresented was question of fact for jury); City of Meridian v. Godwin, 185 So.2d 433 (Miss. 1966) (whether injured garbage truck sideman who had only fourth grade education and who testified he did not read release or have it read to him voluntarily and freely executed release in return for reimbursement for hospital and doctors' bills was jury question); Davis v. Elzey, 126 Miss. 789, 88 So. 630, affirmed on suggestion of error 126 Miss. 789, 89 So. 666 (1921) (where a release and settlement is pleaded in bar of an action for personal injury, and the evidence is in conflict as to his capacity to make an agreement, the question is for the jury, and its decision is binding).
The rationale for these cases was explained by this Court in Kansas City, M. & B. Ry. Co. v. Chiles, 86 Miss. 361, 38 So. 498 (1905). In Chiles, an employee of the railroad was injured by its alleged negligence. Although he had signed a release, the injured employee sued and won. The railroad appealed, arguing that it should have been granted a directed verdict in view of the release. In holding that the lower court properly submitted the question of whether the defendant obtained the release in good faith with a full understanding on the part of the plaintiff of his legal rights to the jury, this Court stated:
No release of this nature should be upheld if any element of fraud, deceit, oppression, or unconscionable advantage is connected *1262 with the transaction. And in passing on the validity of such release, when assailed, all surrounding conditions should be fully developed, and the relative attitudes of the contracting parties clearly shown. So that the jury, in the clear light of the whole truth, may rightly decide which story bears the impress of verity.
Chiles, 86 Miss. at 366, 38 So. at 501.
In the present case, Smith presented facts which could lead a reasonable juror to conclude that the release was not entered into voluntarily and with a full understanding of his legal rights  Smith denied ever reading the release and stated that he only signed it to get out of jail. In view of these statements, there exists a genuine issue as to a material fact. The trial judge improperly entered summary judgment on this ground.
As noted above, at the time of Smith entered into the release he was in prison; additionally, he testified via deposition that his only understanding of the release was that if he signed it, he got out of jail. There was also some indication that Smith might not have understood the significance of what he was signing since it appears he did not even read it. Under the circumstances, it was inappropriate for the trial judge to have ruled on the voluntariness since there were facts supporting Smith's contention of involuntariness.

CONCLUSION
In light of our adoption of the discovery standard for legal malpractice actions, the lower court erred in granting summary judgment on the basis of the statute of limitations. As for the waiver, summary judgment was precluded on that basis due to the existence of material fact questions. Accordingly, the decision of the lower court is reversed and the case remanded for further proceedings as if the motion for summary judgment had been denied.
REVERSED AND REMANDED TO PONTOTOC COUNTY CIRCUIT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.
HAWKINS, C.J., PRATHER, P.J., and SULLIVAN, PITTMAN, BANKS, McRAE and SMITH, JJ., concur.
JAMES L. ROBERTS, Jr., J., not participating.

ON PETITION FOR REHEARING
HAWKINS, Chief Justice, dissenting:
I respectfully dissent. I would grant the petition and affirm the judgment of the circuit court dismissing the complaint.
A large and compassionate heart is an attribute of a great judge, and on this score one can only laud the majority in giving Mr. Smith his day in court. Administration of justice in an orderly society requires other considerations as well, however.
First, some basics. Every citizen knows that laws come from legislative enactments either through congress or state legislatures. Not quite as well known, but certainly ingrained in every lawyer and everyone else who has made any study of government is the other source of law: published appellate court decisions.
Whether natural or man-made, a law by definition must embrace consistency, stability and dependability. If any of these is lacking then it cannot be a law, but is reduced instead to a suggestion, a recommendation, surmise, possibility.
The purpose of man-made law is to prescribe rules  not suggestions  of conduct in a society which can be depended and relied upon by law abiding citizens and prescribe punishment for those few who violate them.
Next, courts do not construe statutes of limitation as to their fairness or equity. Manifestly, they are not "fair," but arbitrary expressions of the will of the people through their legislatures of cut-off dates within which lawsuits may be brought. Here is what this Court has held as to statutes of limitations:

Shewbrooks v. A.C. and S., Inc., 529 So.2d 557 (Miss. 1988):
Limitations on the time within which an action must be brought are created by statute only. They are legislative, not judicial *1263 acts. Thus, in State Board of Adjustment v. State, 231 Ala. 520, 165 So. 761, 762 (Ala. 1936), the Alabama Supreme Court held:
[T]here was no such thing as a limitation of action at common law. The right is wholly statutory, and there are no exceptions to the statute except those made in and by the statute itself.
In Butler v. Craig, 27 Miss. 628, 61 Am.Dec. 527 (1854), this Court, in answer to particular argument of the inequity in applying a limitation statute, held:
[B]ut it has long been the settled doctrine of this court, that no equitable exceptions are to be engrafted upon the statutes of limitation, and that where there is no express exception the court will not engraft one.
In Matson v. Matson, 50 N.M. 155, 200, 173 P.2d 484, 489 (1946), the New Mexico Supreme Court held:
[T]he general principle recognized today for the construction of statutes of limitations is that unless some good ground can be found in the statute for restraining or enlarging the meaning of its general words, they must receive a general construction, and that the courts cannot arbitrarily subtract from or add thereto, and cannot create an exception where none exists, even when the exception would be an equitable one.
* * * * * *
As a general rule the courts are without power to read into these statutes exceptions which have not been embodied therein, however reasonable they may seem. It is not for judicial tribunals to extend the law to all cases coming within the reason of it, so long as they are not within the letter.
* * * * * *
The Legislature having made no exception, the courts of justice can make none, as this would be legislating.
Id. at 564-65.
Cole v. State, 608 So.2d 1313 (Miss. 1992), in which we applied a statute of limitation to a prisoner on death row:
The primary purpose of statutory time limitations is to compel the exercise of a right of action within a reasonable time. These statutes are founded upon the general experience of society that valid claims will be promptly pursued and not allowed to remain neglected. They are designed to suppress assertion of false and stale claims, when evidence has been lost, memories have faded, witnesses are unavailable, or facts are incapable of production because of the lapse of time.
Accordingly, the fact that a barred claim is a just one or has the sanction of a moral obligation does not exempt it from the limitation period. These statutes of repose apply with full force to all claims and courts cannot refuse to give the statute effect merely because it seems to operate harshly in a given case. The establishment of these time boundaries is a legislative prerogative. That body has the right to fix reasonable periods within which an action shall be brought and, within its sound discretion, determine the limitation period... .
Deficiencies, if such there should be, in statutes of limitation should be remedied by the legislature. It should not be the province or function of this court to intrude upon an area peculiarly within the channel of legislative action... .
Id. at 1317-18.
Phipps v. Irby Construction Co., 636 So.2d 353 (Miss. 1993):
In Chase Securities Corp. v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945), the U.S. Supreme Court noted:
Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles. They are practical and pragmatic devices to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost. Order of Railroad Telegraphers v. Railway Express Agency, 321 U.S. 342, 349 [64 S.Ct. 582, 586, 88 L.Ed. 788 (1944)]. They are by definition arbitrary, and their operation does not discriminate between the just *1264 and the unjust claim, or the avoidable and unavoidable delay. They have come into the law not through the judicial process but through legislation. They represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a "fundamental" right or what used to be called a "natural" right of the individual. He may, of course, have the protection of the policy while it exists, but the history of pleas of limitation shows them to be good only by legislative grace and to be subject to a relatively large degree of legislative control.
Id. at 356.
The above holdings from this Court are expressions of the general law:
Statutes of limitations are not simply technicalities; on the contrary, they have long been respected as fundamental to a well-ordered judicial system. Thus, for every cause of action, whether legal or equitable, it is the policy of the state that there shall be a fixed limitation. Furthermore, whether litigants are natural or artificial persons, residents or nonresidents, the time during which the right to sue may be exercised is governed by the statute of limitations.
Origin and history.
At common law, there was no fixed time for bringing of actions. There could then be no limit unless it was fixed by contract.
Limitations are created by statute and derive their authority therefrom; they are legislative and not judicial acts.
54 C.J.S. Limitations of Actions § 1 (footnotes omitted).
The acts of malpractice by Sneed which injured Mr. Smith, namely: failure to give him the autopsy report, occurred no later than July 13, 1979. The statute of limitation applicable thereto at the time was Miss. Code Ann. § 15-1-49:
§ 15-1-49. Limitations applicable to actions not otherwise specifically provided for.
All actions for which no other period of limitation is prescribed shall be commenced within six years next after the cause of such action accrued, and not after.
Mr. Smith filed his complaint June 1, 1988, almost nine years later. Beginning with the enactment of this statute a century preceding 1979 and at least seven years thereafter this Court consistently held that every cause of action under this statute accrued on the date of the injury complained of, not the date it was discovered by the plaintiff. Kilgore v. Barnes, 508 So.2d 1042 (Miss. 1987); Wilder v. St. Joseph Hospital, 225 Miss. 42, 45-46, 82 So.2d 651, 652 (Miss. 1955); M.T. Reed Construction Co. v. Jackson Plating Co., 222 So.2d 838, 840 (Miss. 1969); Smith v. McComb Infirmary Assoc., 196 So.2d 91, 92-3 (Miss. 1967); Johnson v. Crisler, 156 Miss. 266, 125 So. 724 (1930).
This was the law the people of this State relied upon. This is what lawyers advised their clients was "the law."
Today the majority, without citing a single one of the above cases, simply strikes down settled law.[1] What does the majority do instead? It cites cases from another state to support its holding. This is just fine and dandy, but the lawyers and the people of this State did not have to go to other states to find out when a cause of action accrued under Miss. Code Ann. § 15-1-49. They had abundant authority from this very Court extending over a century. That was enough to end the matter.
Well reasoned, consistent Court decisions with clear, unequivocal holdings as to when a cause of action accrued under Miss. Code Ann. § 15-1-49 have not even been given a decent burial by the majority. It is only a blink in the eye of time before every justice who sat on this Court in the last ten years and those who presently occupy it move on. If we give no respect to decisions from our past, simply ignore them, what respect will be given ours? What respect will ours deserve?
*1265 Are decisions of this Court simply essays, to be followed or ignored as we please?
Uncertainty fostered by courts who make decisions by ear, simply to "do right," force law abiding citizens to pay blackmail to settle cases out of court because no one knows what a five-member majority on this Court is liable to do at any one time.
In Ford Motor Co. v. Broadway, 374 So.2d 207 (Miss. 1979), we held that a cause of action of products liability accrued from the date of injury in using the product instead of date of purchase of the product, hardly a departure from our previous holdings and of no benefit to Mr. Smith.
There are but two or our cases cited by the majority, Staheli v. Smith, 548 So.2d 1299 (Miss. 1989), and Owens-Illinois, Inc. v. Edwards, 573 So.2d 704 (Miss. 1990). Staheli involved an interpretation of Miss. Code Ann. § 15-1-35, a one-year statute and which for different reasons could justify a different interpretations. Section 15-1-49 was a six-year statute.
We are convinced that the general policies underlying this statute of limitations will not be thwarted by adoption of the discovery rule in that limited class of libel cases in which, because of the secretive or inherently undiscoverable nature of the publication the plaintiff did not know, or with reasonable diligence could not have discovered, that he had been defamed. In such rare instances, we do not believe that a plaintiff can be accused of sleeping on his rights.
Staheli, 548 So.2d at 1303 (emphasis added).[2]
At first glance, the majority's citation of Owens-Illinois appears supportive, but today's decision illustrates yet another melancholy tendency by a court to transform what should have been a very narrow, limited exception to a rule into the rule for all cases. Owens-Illinois involved the application of § 15-1-49 to asbestos cases. It came to us on an interlocutory appeal from an order overruling a motion to dismiss because § 15-1-49 had run. The circuit court order could have been affirmed on other grounds. It was a products liability case, a progenitor of thousands of cases pending in this state for victims of asbestos toxicity in buildings and on ships in which years had transpired in which the public was totally unaware of any danger. However, the industry did have foreknowledge. It also involved numerous national corporate defendants who have manufactured and installed asbestos over the years. Considering the enormity of the wrongs alleged to have been inflicted by the defendants, affecting millions of American citizens, it could be cogently argued that the Legislature never intended for any statute of limitation to apply to torts of this magnitude. This Court in fact favored such defendants by putting them under the umbrella of Miss. Code Ann. § 15-1-49 as amended in 1989 (ch. 311, Laws 1989). For whatever reason this Court created an exception to our case law in Owens-Illinois, there was no reason to extend the exception to include garden variety torts. Indeed, as we made clear in Stevens v. Lake, Owens-Illinois had no application to legal malpractice. Today that, too, has changed.[3]
Finally, there can be no doubt that the Legislature intended for causes of action to *1266 accrue from the time of the commission of the tort as opposed to the time of its discovery by a plaintiff. Why? Because the Legislature repeatedly re-enacted the statute for at least sixty years after we had so interpreted it. Then, finally, in 1989 (ch. 311, Laws 1989) the Legislature amended Miss. Code Ann. § 15-1-49 to shorten the six-year period to three years, but also putting a savings clause therein:
§ 15-1-49. Limitations applicable to actions not otherwise specifically provided for.
(1) All actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after.
(2) In actions for which no other period of limitation is prescribed and which involve latent injury or disease, the cause of action does not accrue until the plaintiff has discovered, or by reasonable diligence should have discovered, the injury.

(3) The provisions of subsection (2) of this section shall apply to all pending and subsequently filed actions.
Just as the Legislature had in 1976 shortened the statute of limitations as to medical malpractice to two years, but also giving a savings clause for those undiscovered torts, Miss. Code Ann. § 15-1-36 (Ch. 473, Laws 1976), the Legislature in 1989 shortened the time period by one-half to all torts, but again putting in a savings clause of undiscovered torts.
The 1989 amendment by the Legislature to Miss. Code Ann. § 15-1-49 was superfluous, however. We have just amended it on our own retroactively, also retaining 6, not 3 years and Stevens v. Lake has no precedence.
PRATHER, P.J., and BANKS and SMITH, JJ., join this opinion.
NOTES
[1] The majority does cite our recent case of Stevens v. Lake, 615 So.2d 1177, 1181 (Miss. 1993), but strangely ignores our holding therein that in the absence of fraud the statute in a legal malpractice claim under § 15-1-49 begins to run from the date of the act of malpractice, not when it is discovered. I do not know which is worse, to ignore a case or cite it and ignore its clear holding.
[2] Tabor Motor Co. v. Garrard, 233 So.2d 811 (Miss. 1970), involved Miss.Code 1942 Ann. § 6998-06 (Supp. 1968) (Miss. Code Ann. § 71-3-11), in which we held that the two-year limitation to bring an action from date of "injury" under the Workers' Compensation Act meant the date of injury was discovered, not the date of the accident.

Again, this is a two-year statute, and using the word "injury."
[3] Owens-Illinois is nonetheless subject to criticism in that it made no attempt to distinguish or overrule our previous cases holding date of injury or commission of the tort as the accrual date rather than date of discovery, and also contains the following unfortunate statement:

Illogical results, such as the finding that plaintiffs are barred from seeking relief from injuries which are undiscoverable until the pertinent time for seeking such relief has passed, would not only undermine the purposes of which statutes of limitations exist, but would also engender disrespect for our civil justice system.
Owens-Illinois, 573 So.2d at 708-09 (emphasis added).
Statutes of limitation, as the courts universally recognize, are not designed to be "logical," but are arbitrary. Moreover, it is not the function of this court to criticize a duly-enacted statute as illogical or unwise. Clearly, as pointed out infra, the Legislature intended that the causes of action should be deemed to accrue at the time of the commission of the tort under Miss. Code Ann. § 15-1-49, not the date of discovery. Wise or unwise, that was the prerogative of the people, and not this court.
I wonder how logical Miss. Code Ann. § 99-39-5(2) is to Mr. Cole?