# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-00744-COA

PAMELA J. NAIL                                          APPELLANT

v.

WILLIAM R. WRIGHT AND WRIGHT LAW                       APPELLEES
FIRM P.A.

DATE OF JUDGMENT:              01/31/2019
TRIAL JUDGE:                  HON. STEVE S. RATCLIFF III
COURT FROM WHICH APPEALED:    MADISON COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:      HIAWATHA NORTHINGTON II
                              PAUL SNOW
ATTORNEY FOR APPELLEES:       ALEXANDER FRANCIS CONNOLLY
NATURE OF THE CASE:           CIVIL - TORTS-OTHER THAN PERSONAL
                              INJURY AND PROPERTY DAMAGE
DISPOSITION:                  AFFIRMED - 09/08/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1.    A few weeks after finalizing the terms of divorce with her husband, the wife learned that their tax return for the previous year was going to show an income of over $800,000. In her view, the financial statement her ex-husband had provided did not reveal such wealth. Believing her lawyer had mismanaged her case by not learning more about her husband's income, she sued for legal malpractice.

¶2.    Yet the wife sued her lawyer approximately three years and four months after learning of the alleged discrepancy between the income reported on her ex-husband's financial statement and the income reported on the tax return. The trial court dismissed the case with

prejudice as time-barred. She appealed from that dismissal. After review, we affirm.

## BACKGROUND

*The Divorce*

¶3. The core facts of this case are not in dispute. Pamela and Steve Nail were married in 1985, and had four children. After over 25 years of marriage, the two began divorce proceedings. Pamela hired William Wright and his law firm, and Steve hired Richard Roberts and his law firm.

¶4. Pursuant to Uniform Chancery Court Rule 8.05, the spouses exchanged sworn financial statements containing their respective assets and liabilities. Steve's 8.05 statement provided information for over two dozen companies in which he had financial interests. While detailed figures were given for the approximate debt of those companies, the columns for fair market value, net value, and Steve's monetary interest were all labeled "unknown."

¶5. On May 30, 2013, Wright sent a letter to Roberts stating that his client, Pamela, thought Steve's 8.05 statement was incomplete. Wright requested, "Specifically, we would like statements for each asset and liability." "Also, Ms. Nail has reason to believe [the 8.05 statement] does not include each and every asset in his name, including, but not limited to, valuable hunting equipment, a van, and a plane." Wright asked Roberts to update the financial statement so they could send over a settlement proposal.

¶6. Despite Pamela's desire to determine the truth about her husband's finances, Roberts sent a letter a few months later to Wright expressing his belief the dispute was over. The letter began, "Apparently our clients have been engaged in negotiations between

2

themselves." Roberts then added, "[I]t is my understanding that [Pamela] is agreeable to settling the case on the basis of our last offer at mediation."

¶7. After another mediation, the spouses came to terms and consented to a divorce on the basis of irreconcilable differences in September 2013. In the property settlement agreement, which was incorporated as a part of the judgment, Pamela agreed her husband would have sole legal custody of the minor children. "Due to the disparity in the parties' income," the agreement did not require her to pay any child support. Steve kept the house, another unspecified home, and property in Belzoni. He also exclusively kept all of his business interests. The agreement additionally established who among the couple and their children would keep the ten cars. Steve kept his camper and his airplane.

¶8. Under the agreement, the couple agreed that Pamela would receive "rehabilitative periodic alimony on a monthly basis" for five years in the amount of $7,000 per month, totaling $420,000. Pamela also received a lump sum of $10,000, and Steve further agreed to pay $10,500 to her law firm for their services to her.

*The Tax Return and Efforts to Set Aside the Divorce*

¶9. As part of the property settlement agreement, the former spouses agreed to cooperate in a joint filing of their 2012 federal and state tax returns. Just a few weeks after the divorce was final, Steve was preparing to file a tax return for the 2012 year. Shortly before the extended deadline of October 15, 2013, Steve sent over the prepared tax return. It showed that he was going to have a total reported income of $805,088.

¶10. Because it was a joint tax return, Pamela had to sign it before filing it. She signed her

3

return declaring that "[u]nder penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete." Pamela signed the tax return around October 10, 2013.

¶11.    Although she signed the tax return, Pamela and her lawyer both later expressed surprise at Steve's declared income. In Wright's view, the husband's 8.05 statement projected a gross income for that year of about $104,000—resulting in a $700,000 discrepancy between what Wright initially thought Steve's income would be and what it actually was. According to Pamela, she "immediately" called her lawyer about the tax returns.

¶12.    In her words, "the income tax returns came back, and they were [$]800,000 off of what they originally–what [Steve] said that they were. And William, the whole time through my case, told me that I could only–he could only depend on Steve's 8[.]05. And when [the tax returns] came back . . . he said, 'Don't worry. I'll take care of it. We'll take him back to court for fraud.' And I said, 'Great.' I waited and called. And I kept trying to get him on the phone or see what's happening with my case. Months went by, and he wasn't doing anything." She further detailed that in June 2014, she hired a different lawyer "just because William wouldn't do anything."

¶13.    However, the undisputed facts show that in February 2014, her lawyer *did* do something. About four months after Pamela signed the tax return, Wright sent a letter to Roberts protesting the income shown in the tax return. The first line of the February 20, 2014 letter read, "Our client, Ms. Pam Nail, has serious concerns that Mr. Nail did not

4

accurately report his income on his *Rule 8.05 Financial Statement*, which was signed by Mr. Nail on July 2, 2013, and relied upon during mediation on July 17, 2013." The next line discusses how this concern was triggered by the receipt "of the parties' 2012 tax returns, which [they had] reviewed."

¶14. The letter essentially accused Steve of fraud and demanded copies of a variety of 2013 financial documents, such as bank statements, credit card statements, and tax returns. The letter conceded, "Perhaps our suspicions that Mr. Nail did not accurately report his income during the divorce proceedings are not accurate." But it added that Pamela hoped reviewing "these documents [would] put this matter to rest."

¶15. A few weeks after Wright's letter was forwarded, Roberts responded in detail: "As part of this divorce process, you were provided with Mr. Nail's 8.05 Financial Statement which included supporting documentation, and over 300 financial documents regarding Mr. Nail's business interests. Mr. Nail assures us his 8.05 Financial Statement was true and accurate at the time of his execution based on the information he had available to him at the time of completion; however, in the spirit of cooperation, Mr. Nail has gathered the documents requested in your letter and has provided them to our office."

¶16. The letter further stated that "[t]he information contained in the [the corporate tax documents] provided at mediation was accurate based on the information available to the accountant at the time" and had changed as the year proceeded.

¶17. While the exact timeline is unclear, at some point after that exchange, Pamela discharged Wright as her attorney. In 2014, through new counsel, she filed a motion under

5

Mississippi Rule of Civil Procedure 60(b) to set aside the divorce agreement on the basis of fraud. In July 2016, her now-ex-husband was deposed and provided much more information about his finances.

¶18. In the fall of 2016, the chancery court ruled on Pamela's request to set aside the divorce on the basis of fraud. The trial court found Pamela's "case in chief demonstrated [she and her husband] were married for approximately 30 years[,] and [she] understood the lifestyle they had come to enjoy[.]" The trial court held that Pamela "knew or should have known with reasonable care and diligence of the information she asserts was not listed or not accurate on [her husband's] Rule 8.05 disclosure form and/or she had in her possession documents disclosing such information prior to the time when the Final Judgment of Divorce was entered." The trial court further found that "[t]he evidence further showed that [she] failed to discover such information based on her lack of due diligence and reasonable care." As a result, the chancery court denied Pamela's request to set aside her divorce, finding "that [Pamela] failed to prove by clear and convincing evidence that [Steve] made a misrepresentation or committed fraud regarding his U.C.C.R. 8.05 financial disclosure form prior to" the divorce.

¶19. Pamela did not appeal the chancery court's denial of her request to set aside the divorce. While her lawyer advised her that they could appeal, Pamela stated that she could not afford to do it.

*The Suit for Legal Malpractice*

¶20. Less than a month after the trial court ruled against her efforts to set aside the divorce,

6

Pamela shifted tactics. Shortly before Christmas of 2016, Pamela sent a detailed letter to Wright's insurer. She listed what she viewed as Mr. Wright's failures, including his alleged failure to conduct discovery, failure to adequately and fully research her husband's finances, and failure to investigate the perceived discrepancy on the 2012 tax return.

¶21. Pamela demanded $1,046,520 based on her calculation that "a reasonable permanent periodic alimony award for [her] would have been at least $3,000 per month for the rest of [her] life, plus a home to live in." She noted that she "would rather resolve this with Mr. Wright without the necessity of filing a public lawsuit and a public trial."

¶22. The demand was ineffective. On February 28, 2017, Pamela filed suit against Wright for legal malpractice. In an amended complaint, Pamela contended Wright "negligently failed to properly investigate the facts of this case, negligently failed to properly work-up the case, negligently failed to diligently pursue the divorce matter, negligently failed to ascertain the fair market value of the ex-husband's businesses and other assets, and negligently failed to ascertain his true average annual income." These failures, she claimed, "resulted in [her] not receiving fair and equitable distribution of the marital assets, nor a fair permanent monthly alimony award."

¶23. The case was thoroughly litigated, with each side retaining experts to bolster claims and defenses. For his expert, Wright retained Matthew Thompson, the author of a treatise on domestic law and former chair of the Family Law Section of the Mississippi Bar. Thompson opined that Wright had not fallen "below the reasonable standard of care when discovering Steve Nail's finances in connection with an irreconcilable differences divorce"

7

and that if the husband had committed fraud, the chancery court could have set the divorce aside.

¶24. For her part, Pamela relied upon the testimony of her expert, John Christopher, a lawyer with nearly fifty years of experience in practice. Christopher believed "that attorney Wright and his law firm failed to do any discovery whatsoever during the pendency of the underlying lawsuit" and that this failure "fell below the accepted professional standards resulting in substantial damages to his client, Pamela Nail." Pamela also had the testimony of Judith Barnett, a lawyer with extensive experience in domestic law, who stated that "[a] reasonably prudent attorney would have fully investigated the marital assets and income of the ex-husband before any settlement or mediation was done in the case" and that Wright failed Pamela by not doing this.

¶25. Wright sought dismissal of the claims against him via motion for summary judgment, arguing that his representation had not fallen below the standard of care and that Pamela's failure to get the divorce set aside after she terminated his representation further proved this point.

¶26. Wright also focused his argument on the statute of limitations. While protesting that he had not failed her in any way, Wright argued Pamela knew or should have known about any damage she suffered when she saw the 2012 tax return or, in the alternative, no later than the time the final judgment of divorce was entered.

¶27. Pamela disputed that argument and claimed there was no way she could have understood the complexity or legal ramifications of the case. Her affidavit detailed that she

"quit school in the eight[h] grade and [had] a GED" and that she did "not understand anything about business dealings, taxes, or the law"; she instead relied on her lawyer to advise her. Further, she stated that Wright "gave [her] a false sense of security by continually reassuring [her] that things were progressing along fine and to trust him and that he would get [her] a fair settlement (after the judgment was entered)."

¶28. The trial court reviewed the parties' arguments and relied on the uncontested facts to find that "[u]pon receipt of the 2012 tax return in October 2013, [Pamela] Nail discovered what she believed to be her husband's additional undisclosed income." Afterward, "Wright determined that there was an adequate explanation for the alleged additional income, and there were insufficient grounds to set aside" the agreed-upon divorce.

¶29. Notwithstanding the discovery rule applicable to legal malpractice claims, the trial court found that "[Pamela] Nail had knowledge of the 2012 tax return and knew or should have reasonably known of any alleged negligent conduct no later than October of 2013." The trial court ruled that Pamela "was aware of the potential injury of the then newly discovered 2012 tax return, and [that] it [was] not unrealistic or impracticable to believe [Pamela] Nail could and did expect and discover the alleged malpractice and potential injury" at the same time. As to her argument that "the statute of limitations began to run when another lawyer advised her of a potential malpractice claim," the trial court found that such a rule "would allow her to effectively establish her own statute of limitations simply by claiming ignorance of the facts, law and procedure without exercising reasonable diligence, even though she was aware of the conduct for years."

9

¶30. Having identified these material, undisputed facts, the trial court granted summary judgment on Pamela's claims against Wright. After post-judgment rulings, including a denial of a motion to transfer venue, Pamela appealed.

**STANDARD OF REVIEW**

¶31. We review the grant of summary judgment de novo. *Bennett v. Hill-Boren P.C.*, 52 So. 3d 364, 368 (¶12) (Miss. 2011). "When reviewing the evidence on summary judgment, the Court should view the evidence in the light most favorable to the nonmovant." *Id*. "The de novo standard also applies on review of the trial court's application of the statute of limitations." *Id*.

**ANALYSIS**

¶32. Pamela's paramount argument on appeal is that summary judgment should not have been granted based on the statute of limitations. She claims Wright failed her by not fully and adequately investigating her ex-husband's finances and that he actively concealed his failures from her. In her view, Wright's mistakes lead to an issue over when she knew or should have known of any alleged negligence, which would have to be resolved by a jury.

¶33. "The three-year statute of limitations applies to actions for legal malpractice." *Id*. at 369 (¶13); *see* Miss. Code Ann. § 15-1-49 (Rev. 2012). The discovery rule can be applied to legal malpractice cases. *Bennett*, 52 So. 3d at 369 (¶14). "Under the discovery rule, as applied in a legal-malpractice action, the statute of limitations begins to run on the date that the plaintiff learns, or through reasonable diligence, should have learned, of the negligence of the lawyer." *Id*. at (¶15). "The discovery rule is applied when the facts indicate that it is

10

unrealistic to expect a layman to perceive the injury at the time of the wrongful act." *Id*. (internal quotation mark omitted). Our Supreme Court has explained that the discovery rule can be applied in cases of this type "because requiring a layperson to ascertain legal malpractice at the time it occurs would necessitate the retention of a second attorney to review the work of the first." *Id*.

¶34. When there is a genuine issue over whether a statute-of-limitations period has run, that issue is a fact-question which should be resolved by a jury. *See Miss. Valley Silica Co. Inc. v. Barnett*, 227 So. 3d 1102, 1121 (¶47) (Miss. Ct. App. 2016), *abrogated on other grounds by Portis v. State*, 245 So. 3d 457 (Miss. 2018); *Punzo v. Jackson County*, 861 So. 2d 340, 346 (¶22) (Miss. 2003) (In a dispute over whether a bridge was causing a home to flood, the Supreme Court held that "genuine disputes as to the ability to discover a latent injury are questions of fact to be decided by the fact finder, not on summary judgment.").

¶35. In *Bennett*, two sisters sued their former lawyers for botching a wrongful death case involving their late mother. 52 So. 3d at 365-66 (¶1). Two expert-doctors opined that their mother had suffered negligence in a hospital which resulted in a large decubitus ulcer and gangrene in her left leg. *Id*. at 366 (¶5).

¶36. In 2000, the lawyers filed a lawsuit against the hospital and had summons issued. *Id*. at (¶6). However, the process server sent a letter to one of the lawyers stating that the summons to the nursing home had been returned "as faulty." *Id*. About a year later, one of the sisters sought to terminate one of the lawyers and requested return of the file. *Id*. at 367 (¶6). The lawyer never formally withdrew. *Id*. In 2005, "[t]he trial court dismissed the case

for want of prosecution[.]" *Id.*

¶37.   There was no question the lawyer had failed to effect service on the defendant.  In fact, discovery revealed that the lawyer owned a file folder that contained legal research detailing how to lengthen the time for service of process.  *Id.* at (¶7).  "However, neither [of the lawyers] ever sought the issuance of an alias summons or sought leave from the court for additional time to effect service of process."  *Id.*  After the sisters hired a new lawyer, his note in the file about the status of the case said, "What a mess."  *Id.* at (¶8).

¶38.   The sisters ultimately filed a lawsuit against their former lawyers in 2007.  *Id.* at 368 (¶10).  The lawyers argued that the statute of limitations had passed on any claims. *Id.*  "In response, [the client] asserted that, under the discovery rule, the earliest time that she knew or reasonably should have known of the alleged malpractice was when her new counsel had obtained the case file in 2005."  *Id.* at (¶11).  The trial court held that the statute of limitations began to run when the client had attempted to terminate the lawyer in 2001 or at a later date in 2002 when he had unsuccessfully tried to settle the case.  *Id.*

¶39.   On appeal, the Supreme Court reversed because "the evidence submitted on summary judgment created a 'genuine issue of material fact' as to whether the first time that [the sisters] knew or with reasonable diligence should have known of the alleged malpractice was when their new attorney received the case file in 2005."  *Id.* at 370 (¶19).  The uncontested facts revealed that the lawyers "admitted in their interrogatory responses that they never had informed [their clients] of the failure to serve" the hospital.  *Id.*  "Viewing the evidence in the light most favorable" to the nonmovant, the Court held that the client "presented evidence

that she and [her sister] had lacked actual knowledge of the alleged malpractice prior to her new counsel's review of the case file in 2005." *Id*.

¶40.   Nor did it matter that the clients did not peer into the court records because "they had received no information that should have alerted a layperson to possible negligence." *Id*. at 370 (¶23). "The news that their attorneys were having trouble or difficulty with serving [the hospital] was not the type of information reasonably guaranteed to communicate to a layperson that the reason for the difficulty was that their attorneys may have been guilty of negligence." *Id*. For these reasons, and based on the complicated nature of the responses their lawyers had provided them, the Court found that "there was a genuine issue of material fact as to when [the clients] knew, or in the exercise of reasonable diligence should have known, of the alleged legal negligence," and that the lawyers' evasive answers to them also created "genuine issues of material fact concerning possible fraudulent concealment." *Id*. at 373 (¶28).

¶41.   Pamela relies on this case for the proposition that the trial court should not have dismissed her case. However, in many ways her case is the inverse of *Bennett*. There, the lawyers admitted only *they* knew about the failure to achieve service of process on the defendant and that "they never had informed [their client] of the failure to serve" the hospital. *Id*. at 370 (¶9).

¶42.   In contrast, in this case it is uncontested that Pamela knew of the alleged discrepancy in her husband's income—which is the basis for her claims against Wright. On October 10, 2013, Pamela signed the joint tax return for her and her husband. She did so under penalty

13

of perjury by stating that everything in the tax return was correct. Pamela did not refuse to sign the tax return.

¶43. On that day, she learned of what she believed was a $700,000 income discrepancy. Furthermore, as she testified in her deposition, she "immediately" called her lawyer to talk about the issue. As the trial court concluded, because the injury was discovered at that moment, the statute of limitations began to run. While Pamela may not have understood or fully comprehended the alleged failures or inaction that led to the income discrepancy, she fully knew of the difference in what she saw on her ex-husband's 8.05 statement and what she saw on the tax return. Because her discovery took place more than three years before she filed suit against her attorney, the claims are time-barred.

¶44. Even viewing the evidence in the light most favorable to the nonmovant, the record reveals Pamela's knowledge about the discrepancy at another point. Three years and eight days before she filed suit, Wright sent her ex-husband's lawyer a letter affirming that Pamela *knew* something was wrong. On February 20, 2014, her lawyer sent a letter to the husband's lawyer. The first line reads, "Our client, Ms. Pam Nail, has serious concerns that Mr. Nail did not accurately report his income on his *Rule 8.05 Financial Statement*, which was signed by Mr. Nail on July 2, 2013, and relied upon during mediation on July 17, 2013." The next line discussed how this concern was triggered by the receipt "of the parties' 2012 tax returns, which [Pamela and her attorney] reviewed." The letter also shows that more than three years before she filed suit against Wright, Pamela affirmatively knew of the harm she allegedly suffered due to her lawyer's negligence.

14

¶45. This letter greatly diminishes any subsequent claim by Pamela that she was unaware of the financial discrepancy that she claims she failed to notice because of her lawyer's failures. Not only did she sign and verify under oath on October 10, 2013, that she agreed the tax return was correct—and therefore clearly disclosed her knowledge of the alleged financial discrepancy—she then threatened further legal action through her attorney on February 20, 2014. Both of these events definitively occurred more than three years prior to her filing suit against Wright for legal malpractice.

¶46. Furthermore, while the moment she signed the tax return may have revealed the sum total of what she believed was proof her husband was concealing assets and money, Pamela had already been investigating the veracity of her husband's finances. Months before the divorce was final, Pamela had suspected that the 8.05 statement was flawed. On May 30, 2013, Ms. Nail's lawyer sent a letter to her husband's lawyer stating that "Ms. Nail [had] reason to believe" her husband's 8.05 statement was incomplete after seeing that the form omitted a plane he owned, a van, and hunting equipment. Also, critical financial values were listed as "[u]nknown."

¶47. Even viewing the evidence in the light most favorable to the nonmovant, the discovery rule only means that the statute of limitations begins to run on the date that the plaintiff learns, or through reasonable diligence, should have learned of the negligence of the lawyer. All of Pamela's claims against Wright are premised on the idea that his failure to investigate her husband's finances resulted in her loss. Yet she personally learned of the alleged loss more than three years before filing suit. Further, the timeline established by the record shows

15

that it was only after her efforts to set aside the divorce faltered that Pamela began to pursue a malpractice claim against Wright.[1]

¶48. Pamela's admitted knowledge of the alleged income discrepancy is also reason enough for us to conclude that it is not necessary that a jury resolve the statute of limitations issue. When she signed the joint tax return on October 10, 2013, Pamela swore under penalty of perjury that she understood the tax return and that everything in it was true. She later testified that the amount of her husband's income shocked her. But this surprise is premised wholly on the reality that she discovered it the same day she signed the tax returns. Because there is no factual dispute as to when she learned of the injury that she attributed to her attorney, there is no need for a jury to resolve the question of when the statute of limitations

---

[1] The separate opinion focuses on one alleged act of negligence related to the chancery court's refusal to set aside the divorce. Pamela claimed that her lawyer failed her by not filing the Rule 60(b) motion to set aside the divorce and that he "should have filed the Rule 60(b) motion immediately in order to preserve their client's rights."

However, the claim to set aside the divorce is set on the same foundation as the other issues in this case—that Steve allegedly misrepresented his income on his 8.05 statement. Like the other issues, the date that was learned by Pamela is dispositive. It is undisputed that Pamela learned of any discrepancy in income at the moment she signed the joint tax return under penalty of perjury. Pamela was also aware that no such motion had been filed by Wright.

Furthermore, Pamela's successive counsel did file a motion to set aside the divorce; in considering the matter, the chancery court concluded that Pamela could not meet the standard to set aside the divorce under Rule 60(b)(1) or Rule 60(b)(6). In denying the request to set aside the divorce, the chancery court made a factual finding that after 30 years of marriage, Pamela "understood the lifestyle they had come to enjoy" and so "knew or should have known with reasonable care and diligence of the information she asserts was not listed or not accurate on [her husband's] Rule 8.05 disclosure form and/or she had in her possession documents disclosing such information prior to the time when the Final Judgment of Divorce was entered." The trial court further found that "[t]he evidence further showed that [she] failed to discover such information based on her lack of due diligence and reasonable care."

16

began to run.

¶49. All clients are entitled to lawyers who will be diligent, competent, and zealous. While the discovery rule can be applied in legal malpractice cases, "the statute of limitations begins to run on the date that the plaintiff learns, or through reasonable diligence, should have learned, of the negligence of the lawyer." *Bennett*, 52 So. 3d at 369 (¶15). Because the client in this case affirmatively knew that there was a discrepancy in her husband's financial status and that it had not been learned during the litigation of her divorce, she had three years from the moment she discovered the alleged discrepancy to file suit against her attorney. Because Pamela waited over three years before filing suit, the trial court was correct to dismiss her suit as time-barred.

¶50. On appeal, Pamela also maintained an argument that the circuit court should have transferred her suit to chancery court. Our affirmance of the summary judgment dismissal means this issue does not have to be addressed.

¶51. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS AND McDONALD, JJ., CONCUR. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. LAWRENCE, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, J.**

**LAWRENCE, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶52. I agree with the majority that any legal malpractice claims by Pamela concerning the handling of the divorce and/or the inadequate investigation of Steve's finances during the pendency of the divorce are barred by the statute of limitations. Those claims were

17

discoverable in October 2013, and the period to file an action ended in October 2016. However, I disagree that all of Pamela's alleged legal negligence claims in her amended complaint are barred. Therefore, I would reverse the dismissal of the remaining claim based on Rule 60(b) and remand this case for further proceedings.

## I. The Divorce

¶53. Pamela and Steve's divorce was finalized by an agreed order on September 3, 2013. The mediation during July of that year apparently had its intended effect; the parties resolved the issues together and told their lawyers to draft the necessary documents. Those documents were prepared and submitted to the trial court, which entered the orders terminating the marriage and resolving all property issues. In October of that same year, Steve's 2012 tax returns were completed, and a copy was forwarded to Pamela's attorney, William Wright. Upon review, it was obvious there was a discrepancy in the total income between the tax returns Steve had prepared for the couple and Steve's Rule 8.05 financial statements that had been exchanged prior to the mediation.[2]

¶54. Pamela became immediately concerned about the additional income listed on the tax returns, which was not listed on Steve's Rule 8.05 financial statement and contacted her divorce attorney, Wright. Wright did not file any motions with the court. Rather, he sent Steve's attorney a letter (dated February 24, 2014) inquiring about the substantial income discrepancy. Finally, in June 2014, Pamela, unsatisfied with Wright's inaction, went to another attorney (Barnett) who filed a Rule 60(b)(6) motion alleging fraud and concealment

---

[2] While Steve's Rule 8.05 financial statement indicated his total income for 2012 was $104,796, the 2012 tax return indicated a total income of $805,088.

18

of income on Steve's part.  The motion requested the original divorce order be modified. The trial court ultimately denied that motion.

## II.    The Complaint

¶55.    Pamela filed a legal malpractice lawsuit against Wright on February 28, 2017.  The original lawsuit alleged a failure to properly investigate and conduct discovery during the divorce proceedings.  The basis for that allegation arose out of the income discrepancy regarding Steve's true financial condition.  The complaint specifically stated:

> [Wright] failed to advise and to disclose to Plaintiff that upon information and belief, [Wright] knew or had reason to know that certain financial valuations should have been made to properly assess Plaintiff's Ex-husband's financial holdings and assets . . . . [Wright] **failed to properly research and investigate the Ex-husband's income**, financial holdings, and other assets.

(Emphasis added).  The original complaint only alleged that Wright failed to properly investigate Steve's financial condition during the divorce proceeding.  The original complaint did not allege that Wright committed legal malpractice by failing to file a Rule 60(b) motion after the discovery in October 2013 of the substantial discrepancy in the 2012 tax return and the Rule 8.05 financial statement.  That language was added in the amended complaint.  The trial court determined that Pamela knew or should have known of Wright's potential legal malpractice when she received the tax returns on October 14, 2013.  Therefore, according to the trial court, the statutory limitations period expired three years later on October 14, 2016. Because Pamela's complaint was filed February 28, 2017, the trial court dismissed the entire action.

¶56.    The majority affirms the trial court's grant of summary judgment on the statute-of-

19

limitations issues. I agree with the majority in affirming the trial court's determination that Pamela was aware of any potential lack of investigation by Wright during the divorce in October 2013 when she received the tax returns. Because the complaint was filed more than three years later on February 28, 2017, the statutory limitations period had expired on that particular claim. However, Pamela also claimed that Wright committed malpractice when he failed to take corrective action under Rule 60(b) within six months of learning of the income discrepancy and potential fraud. That is a separate legal claim for which a different statute-of-limitations time period applied.

### III. The Amended Complaint

¶57. On September 22, 2017, Pamela filed an amended complaint against Wright, alleging:

> By negligently failing to file anything whatsoever and allowing the six (6) month deadline to expire. Not only did Defendants fail to file the Rule 60(b) motion within the six (6) month deadline, but they failed to advise the client that it should be filed within six (6) months of the Judgment date. (This is a critical point because if a party waits more than six (6) months postjudgment, then the standard for setting aside a judgment is one of fraud on the Court, not fraud on the adverse party. The standard is much higher, clear and convincing evidence, to prove fraud on the Court according to Mississippi case law.).

Wright filed an amended answer denying the new allegations of legal malpractice. Mississippi Rule of Civil Procedure 15(c) states that "[w]henever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." Thus, any allegation alleged in the amended complaint related back to the filing of the original complaint as long as the new allegations arose out of the same conduct or occurrence. All of the allegations in the complaints arose out of Wright's

20

alleged legal malpractice concerning Steve's income and the accurate reporting of that income.

¶58. Further, in response to Wright's motion for summary judgment, Pamela attached affidavits from various attorneys. One of the attorneys, John Christopher, clearly opined that Wright committed legal malpractice when he failed to file a Rule 60(b) motion for fraud within the six-month time requirement. His affidavit stated as follows:

> After Mr. Wright received Mr. Nail's 2012 federal income tax return which evidenced that Mr. Nail has made substantially more money in 2012 than he had reported on his 8.05 financial statement, Mr. Wright did not take action to set aside the divorce judgment via Rule 60. Mr. Wright knew, or with reasonable diligence should have known, upon receiving Mr. Nail's 2012 income tax return on October 14, 2013, that Mr. Nail misrepresented his income to the court and to Mrs. Nail. Even after learning of Mr. Nail's misrepresentation of his income to the court and to Mrs. Nail, **Mr. Wright failed to file a motion for relief from the judgment pursuant to [Rule] 60(b), which provides that he had six months from the date of the judgment to file the motion.**

(Emphasis added).

¶59. In *Smith v. Sneed*, 638 So. 2d 1252, 1255-58 (Miss. 1994), the Mississippi Supreme Court held that the statute of limitations in legal malpractice actions begins to run on the date the client learns or through exercise of reasonable diligence should have learned of the lawyer's negligence. In doing so, the court stated that "any burden placed upon an attorney by application of the discovery rule is less onerous than the injustice of denying relief to unknown victims." *Id*. at 1258 (quoting *Willis v. Maverick*, 760 S.W.2d 642, 645-46 (Tex. 1988)). Further, the court held that a tort **must be completed** before the statute begins to run. *Id*. at 1255-56. "For legal-malpractice claims predicated on negligence, the plaintiff

21

'must prove by a preponderance of the evidence: (a) the existence of an attorney-client relationship; (2) negligence on the part of the lawyer in handling the affairs of the client which have been entrusted to the lawyer; and (3) proximate cause of the injury.'" *Gibson v. Williams, Williams & Montgomery P.A.*, 186 So. 3d 836, 848 (¶34) (Miss. 2016) (quoting *Pierce v. Cook*, 992 So. 2d 612, 617 (¶11) (Miss. 2008)).

¶60.    Here, the "act" that allegedly resulted in malpractice could not have occurred any earlier than the time to file a Rule 60(b) motion expired. The legal malpractice claim on failing to file a Rule 60(b) motion did not even accrue until the time to file the motion expired in March 2014. In other words, since the judgment of divorce was dated September 3, 2013, Attorney Wright had six months from that date to file a Rule 60(b)(1) motion. Therefore, Attorney Wright had until March 3, 2014, to file a motion to set aside the September judgment under Rule 60(b)(1). His failure to do so was the exact allegation of negligence in the amended complaint.

¶61.    The trial court incorrectly lumped all of Pamela's legal malpractice claims together when they were separate and distinct torts entailing different duties at different times.[3] One was alleged to have occurred during the divorce proceeding (failure to investigate) and one was alleged to have occurred after she received Steve's tax returns (failure to file a Rule 60

---

[3] The trial court did not specify that it was ruling under Rule 60(b)(1) and Rule 60(b)(6) as stated by the majority. The amended complaint and the affidavits attached to the plaintiff's response to the motion for summary judgment clearly articulate a separate claim for failure to file a Rule 60(b)(1) motion, yet the court never addressed that claim. As a result, the court erroneously combined the plaintiff's legal malpractice claims and improperly applied the same limitations period to both claims when they, in fact, accrued at different times.

22

motion). The failure to investigate financial claims was known or reasonably likely to be discovered on or after October 14, 2013, when the tax documents were in hand. The breach of the duty to file a Rule 60(b) motion could not occur until the six-month time period allowed by Rule 60(b) expired. The earliest that six-month period would have expired was March 3, 2014, meaning the three-year limitations period would not have expired until March 3, 2017. Pamela filed her complaint on February 28, 2017. Because I believe that the trial court incorrectly held the limitations period ran on the failure to file a Rule 60(b) motion claim and dismissed that claim when it was filed within the limitations period by virtue of Rule 15(c), I respectfully dissent.

**GREENLEE, J., JOINS THIS OPINION.**